GRAND RAPIDS & INDIANA RAILWAY CO. *v.* COBBS & MITCHELL.

1. CARRIERS — RAILROAD COMPANIES — STATE REGULATION — CONTRACTS—STATUTES.

The enactment of Act No. 300, Pub. Acts 1909 (2 Comp. Laws 1915, § 8109 *et seq.*), regulating common carriers and prohibiting unjust discrimination among shippers, rendered void a contract between a railway company and a lumber company whereby the railway company agreed to furnish cars for unlimited time free from demurrage charges, although said contract was lawful at the time it was entered into.

See note in 6 L. R. A. (N. S.) 834.

2. SAME—CONSTITUTIONAL LAW—POLICE POWER.

> Said act cannot be said to impair the obligation of a contract within the constitutional inhibition, since it was entered into with the knowledge that the State, in the exercise of its police power, could pass laws regulating common carriers within its borders, and the hands of the State in the exercise of this power may not be tied by private contract.

3. SAME—DEMURRAGE—CONTRACTS—RECOUPMENT.

> In an action for demurrage charges subsequent to the passage of the act, the railway company was entitled to recover, since the contract was void; and defendant could not recoup its damages for the breach of an unenforceable contract.

Error to Kent; Brown, J. Submitted June 6, 1918. (Docket No. 64.) Decided September 27, 1918.

Assumpsit by the Grand Rapids & Indiana Railway Company against Cobbs & Mitchell, incorporated, for demurrage charges. Judgment for plaintiff. Defendant brings error. Affirmed.

*Norris, McPherson, Harrington & Waer,* for appellant.

*James H. Campbell,* for appellee.

FELLOWS, J. Plaintiff, hereafter called the railroad company, operates a line of road from the Straits of Mackinac to Grand Rapids, and from there to Ft. Wayne, Indiana, passing through Cadillac and Boyne Falls in the State of Michigan. Defendant, hereafter called the lumber company, operates its mill at Cadillac and has extensive holdings of timber lands near Boyne Falls. Much of its timber lands had been acquired prior to the making of the contract hereafter referred to, and its holdings of timber lands in the vicinity of Boyne Falls have been considerably augmented since. Its investment in the business exceeds a million dollars.

The lumber company was transporting its logs from forest to mill over the line of the railroad company under an arrangement not appearing in the record, until October 1, 1899. On that date the parties entered into a contract for future transportation and services, the railroad company being named as the first party and the lumber company as the second party. The contract very fully sets up their agreement and contains among its many provisions the following:

"The second party agrees to furnish all the cars for the transportation of the logs as herein provided, such cars to be those theretofore used for like service by the second party. They shall be kept in proper repair by the second party.

"The first party reserves the right to use, instead of the logging cars in question, such a number of its standard flat cars as it can spare for the service; to the extent that such flat cars may be used the logging cars will be displaced.

"The second party shall be responsible for the first party's cars while off its line and in the second party's possession. In case they shall be injured, damaged or destroyed, the second party will make good the loss.

"The cars to be provided by the first party are to be rent free, and are to be deemed, while in the service herein contemplated, to be in the possession of the second party as near as may be."

On July 1, 1902, this contract was modified by the parties by a supplemental agreement containing only the following provision:

"Provision was made in the contract for the use of the standard flat cars of the first party, instead of the logging cars belonging to the second party. The second party now wishes the change to be made and the first party is willing that it should be done. The new service will begin at the date hereof.

"The rate for hauling the logs shall be one dollar per thousand feet and the cars shall be loaded with a minimum amount of four thousand feet each.

"The contract in question in all other respects shall continue as the arrangement between the parties in respect to the service in question."

Since the execution of this supplemental agreement the railroad company has furnished its cars for the conduct of the business and the performance of the contract. Pursuant to the provisions of Act No. 300 of the Public Acts of 1909 (2 Comp. Laws 1915, § 8109 *et seq.*) the railroad company filed with the railroad commission and published its tariffs, including its rules, regulations and charges for demurrage. Two days' free time for loading and unloading was given and $1 per day demurrage charge thereafter was fixed. No objection to this tariff by an interested party was made, nor any proceedings taken by the commission upon its own initiative.

The present action is brought to recover demurrage charges, some accruing at Boyne Falls and some at Cadillac. It was tried by the court without a jury and resulted in a judgment for plaintiff. There was some testimony that the cars were bunched; that is, that more cars were delivered to the lumber company than it could use or than its contract required, but this testimony was of so general a character that we would not be justified in disregarding the finding of the court that the cars were delivered to the lumber company pursuant to the terms of the agreement. The case seems to have been tried in the court below and submitted to this court upon the assumption that the clause of the original contract, as amended by the supplemental agreement providing for the free use of the cars, was valid when made. The case having been tried and submitted on that theory, we shall for the purposes of the case accept such assumption without deciding that question, and dispose of the case upon the record as made. The meritorious questions therefore presented to this court upon this record are:

(1) Does Act No. 300, Pub. Acts 1909, put an end to special contract rates for services performed by a railroad company, which special contract rates would result in unjust discrimination?

(2) If so, does it impair the obligation of contract within the constitutional inhibition?

That the portion of the contract making no limit upon the free time the lumber company might retain the plaintiff's cars was valid and enforceable at the time it was executed and until the legislature acted, is assumed by both parties. Nor can it be questioned that the contract would be unenforceable if now executed. Such a special contract giving to the lumber company free use of cars for unlimited time, when other shippers were required to pay $1 per day for all time over two days, would be unjustly discriminating in the highest degree. Therefore, the question for our solution is whether a provision of a contract valid when made, which would be invalid if now executed, comes within the purview of the act, and if so, whether the act itself squares with the Constitution.

It must be constantly borne in mind that we are dealing with a contract made with a public utility, a common carrier; that the movement was an intrastate movement; and that the State had the exclusive legislative prerogative over intrastate commerce, at least until congress should act, and that at this time congress had taken no steps looking towards Federal control of intrastate affairs.

We shall not attempt to cite the many acts passed by congress and the various States of the Union looking to the regulation of the railroads of the country. Suffice to say that congress acting within its sphere, regulating interstate carriers, and States acting within their sphere, regulating intrastate carriers, have passed many wholesome laws looking to the proper discharge by these public utilities of their duty to the

public and their regulation by the public they serve. Running through this legislation may be found the steadfast purpose of the legislative department to eradicate, root and branch, unjust discrimination for special shippers and the requirement of like charge and like service to all. This State, by a comprehensive act (Act No. 300, Pub. Acts 1909), kept pace with the other States of the Union. Prior to the bringing of this action various amendments to this act had been passed. See Act No. 139, Pub. Acts 1911; Act No. 173, Pub. Acts 1911; Act No. 370, Pub. Acts 1913; Act No. 389, Pub. Acts 1913.

By the provisions of the act in question, every common carrier was required, within 90 days, unless further time was granted by the commission, to file with the commission all schedules of rates (section 10$i$); such schedules are also to be kept open for public inspection and are required to contain, stated separately, "all terminal charges, storage charges, icing charges and all other charges which the commission may require, all privileges or facilities granted or allowed, and any rules or regulations" affecting the rates, and prohibits changes in such schedules of rates without giving ten days' notice; prohibits the carrier from engaging in its business unless such schedules are filed and published, and also prohibits the carrier from collecting any greater, less, or different compensation than therein specified (section 10). The amendment to this section by Act No. 139, Pub. Acts 1911, is unimportant here. By section 17 it is provided:

"It shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality or any particular description of traffic in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality or any particular description of traffic to any undue or unrea-

sonable disadvantage or prejudice in any respect whatsoever."

Express authority is given the commission to fix demurrage charges (section 8). The act provides severe penalties for its violation. It was passed under the police power of the State, and in the exercise of the sovereign power of the State to regulate public utilities.

The property of the carriers is charged with a public interest, their business subject to governmental control within the limits of the Constitution. That the cars of a carrier must be loaded and unloaded promptly and kept moving if it discharges its functions, its duty to the public, is self-evident. Experience has taught that a charge against a shipper for the retention of a car after a reasonable time to load or unload, a demurrage charge, puts the car back in use for transportation more promptly than any other known method. Demurrage charges are, and for some time have been, imposed by all railroads. They are recognized as legitimate charges, and, properly levied and collected, serve a useful purpose. A carrier may not work discrimination through demurrage charges any more than it may work discrimination through a charge for line haul. The law contemplates the eradication of unjust discrimination in every form, and discrimination may be as unjust and unfair to other shippers, to the public generally, when provided for in an existing contract as though indulged in without prearrangement. The legislature did not, by section 11 of the act or by any other section or provision, exempt from the operation of the act special existing contracts which were not common to all shippers for a like kind of traffic, and we cannot without judicial legislation write such exemption into the law.

Does the law as so construed impair the obligation of contracts within the constitutional inhibition?

When these parties entered into this contract they did so with the knowledge that the State, in the exercise of its police power, could pass laws regulating common carriers within its borders. Could these parties by private contract tie the hands of the State in the exercise of this power? Manifestly not. The language of Mr. Justice COOLEY, when a member of the interstate commerce commission and writing for that commission in the case of *Kentucky & Indiana Bridge Co.* v. *Railroad Co.*, 34 Am. & Eng. R. Cas. 630, is quite in point. He said:

"If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable."

Mr. Parsons, in his work on Contracts (vol. 2, p. 674), thus tersely states the rule:

"If one agrees to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise."

In the case of *Atkinson* v. *Ritchie*, 10 East, 530, Lord Ellenborough said:

"That no contract can properly be carried into effect, which was originally made contrary to the provisions of law, or which being made consistently with the rules of law at the time, has become illegal in virtue of some subsequent law are propositions which admit of no doubt."

In the case of *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211 (20 Sup. Ct. 96), the court, in considering the power of congress to regulate commerce, and discussing the liberty of the citizen to make contracts, very clearly pointed out that if individuals or corporations could by enforceable contract regulate such commerce the power of congress

would be materially limited. The court said, speaking through Mr. Justice PECKHAM:

"The power of congress over this subject seems to us much more important and necessary than the liberty of the citizen to enter into contracts of the nature above mentioned, free from the control of congress, because the direct results of such contracts might be the regulation of commerce among the States, possibly quite as effectually as if a State had passed a statute of like tenor as the contract.

"The liberty of contract in such case would be nothing more than the liberty of doing that which would result in the regulation, to some extent, of a subject which from its general and great importance has been granted to congress as the proper representative of the nation at large. Regulation, to any substantial extent, of such a subject by any other power than that of congress, after congress has itself acted thereon, even though such regulation is effected by means of private contracts between individuals or corporations, is illegal, and we are unaware of any reason why it is not as objectionable when attempted by individuals as by the State itself."

The case of *Louisville, etc., R. Co.* v. *Mottley,* 219 U. S. 467 (31 Sup. Ct. 265, 34 L. R. A. [N. S.] 671), is quite in point. In 1871 Mottley and wife were seriously injured in a collision on the railroad of the plaintiff in error. An agreement was entered into between them and the company whereby their claim for damages was settled by an agreement of the company to issue to them free passes on its road during the remainder of their lives. This contract was performed by the railroad company until the enactment by congress of the so-called Hepburn bill, being the act of June 29, 1906 (34 U. S. Stat. 584), some of the provisions of which were engrafted into Act No. 300, Pub. Acts 1909. Mottley thereupon brought suit for the specific performance of the contract. The court fully considered the question and held that although

the contract was lawful and enforceable when made the subsequent enactment of the act of June 29, 1906, made its enforcement unlawful and denied the relief sought. See, also, *Fitzgerald & Co.* v. *Railroad Co.,* 63 Vt. 169 (22 Atl. 76, 13 L. R. A. 70) ; *Grand Trunk Western R. Co.* v. *Railroad Commission,* 221 U. S. 400 (31 Sup. Ct. 537) ; *Home Telephone Co.* v. *City of Los Angeles,* 211 U. S. 265 (29 Sup. Ct. 50). The recent case of *Traverse City* v. *Railroad Commission,* 202 Mich. 575, is upon principle quite analogous. In the *Mottley Case* it was said by the court:

"We forbear any further citation of authorities. They are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the commerce act, it cannot now be enforced against the railroad company, even though valid when made. If that principle be not sound, the result would be that individuals and corporations could, by contracts between themselves, in anticipation of legislation render of no avail the exercise by congress, to the full extent authorized by the Constitution, of its power to regulate commerce."

What we have said not only disposes of the question of the plaintiff's right to recover but also defendant's claim that even though plaintiff may recover, it (defendant) may recoup its damages for the breach of the contract in failing to provide the use of its cars free and without demurrage charges. Obviously defendant cannot recoup its damages for the breach of an unenforceable contract.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.