## WESTERN UNION TELEGRAPH CO. v. ESTEVE BROS. & CO.

(Circuit Court of Appeals, Fifth Circuit. May 26, 1920.)

No. 3506.

1. **Telegraphs and telephones** ⬅54(7)—**Limitation of liability not binding on sender without notice.**

Where plaintiff delivered a telegraphic message to the government telegraph company at Barcelona, Spain, for transmission to New Orleans, which message was correctly transmitted by the Spanish & French telegraph systems to Havre, where it was delivered to defendant for further transmission by cable and land lines to New Orleans, and in such transmission from New York it was materially cl anged, causing serious financial loss to plaintiff, a regulation of defendant, unknown to plaintiff, limiting its liability for mistakes or negligence in transmission or delivery to the amount paid for the service unless the message was repeated, for which a higher rate was charged, *held* not binding on plaintiff.

2. **Telegraphs and telephones** ⬅54(7)—**Filing of rates and regulations not required by law not notice of limitation of liability.**

The Interstate Commerce Act, as amended (Comp. St. § 8563 et seq.), does not require telegraph or cable companies to adopt and file schedules of rates and regulations in regard to transmission of messages, and in the absence of such requirement by the Interstate Commerce Commission the filing of rates and regulations by a telegraph company does not charge a sender with notice of such regulations or of a classification of messages therein, permitted, but not required, by section 8563(3), and a sender of a message is not bound by such a regulation limiting the liability of the company for negligence, to which he did not assent, and of which he had no knowledge or notice.

3. **Telegraphs and telephones** ⬅67(1)—**Damages, including special damages, recoverable for error in transmission.**

In the absence of statutory or contractual modification of the liability of a telegraph company, if there is negligent failure to transmit a mes-

sage correctly, the party in whose favor the liability is incurred is entitled to recover such damages as are the direct and natural result of that breach of duty, including special damages which the terms of the message disclose to be likely to result from the default.

4. **Telegraphs and telephones ☞36—Sender given preferential rate, without his knowledge, may recover for negligence.**

Interstate Commerce Act, §§ 1(3), and 3, as amended (Comp. St. §§ 8563[3], 8565), requiring charges by telegraph companies to be just and reasonable, and prohibiting unjust or unreasonable preferences, do not enable a telegraph company to escape liability for breach of its undertaking to render a service in the line of its business by showing that the party for whom that service was undertaken was, without his knowledge or fault, charged less therefor than its reasonable value or than was charged others for similar services, or was otherwise accorded undue preferential treatment.

In Error to the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Action at law by Esteve Bros. & Co., against the Western Union Telegraph Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Certiorari granted, 254 U. S. ——, 41 Sup. Ct. 13, 65 L. Ed. ——.

Esmond Phelps, of New Orleans, La., and Rush Taggart, of New York City, for plaintiff in error.

J. Blanc Monroe and Monte M. Lemann, both of New Orleans, La., for defendant in error.

Before WALKER, Circuit Judge, and CALL and HUTCHESON, District Judges.

WALKER, Circuit Judge. This was an action by the defendants in error (herein referred to as the plaintiffs) against the plaintiff in error, the Western Union Telegraph Company (herein referred to as the defendant), for the alleged amount of the loss or damage occasioned to the former by the latter's negligent failure to transmit correctly a cable message addressed and sent on September 13, 1917, to the plaintiffs at New Orleans, La., by its representative at Barcelona, Spain, where the plaintiffs have their main office. The body of the message as sent read:

"Sell two hundred bales futures, naming equivalent New Orleans October price."

The body of the message as it was delivered by the defendant at New Orleans read:

"Sell two thousand bales futures, naming equivalent New Orleans October price."

On the trial the following facts were admitted: The plaintiffs at Barcelona deposited the above-mentioned message in the central office of the telegraph administration, which is owned and operated by the Spanish government, for transmission to New Orleans. It was correctly transmitted by the Spanish telegraph administration to Paris, France, was correctly transmitted by the system of telegraphs owned

and operated by the French government from Paris to Havre, France, and was there delivered to the defendant, which transmitted it correctly by cable to New York City, and turned it over, reading correctly, to its land line system. An error occurred in the transmission of the message by the defendant from New York City to New Orleans; the word "thousand" being substituted for "hundred." The amount paid by plaintiffs to the Spanish telegraph administration at Barcelona for the transmission, in the above-stated manner, of the message to its destination was $6.60, of which the defendant subsequently received $4.65 for transmitting it from Havre to New Orleans, of which $3.75 was apportioned to the transmission from Havre to New York and 90 cents to transmission from New York to New Orleans. Immediately upon receipt of the message as it read when delivered on the day it was sent, the plaintiffs' New Orleans office sold 2,000 bales of cotton for future delivery in January at 19.57 cents per pound, and on September 15, 1917, advised its Barcelona office by cable, sent over the defendant's lines, that it had done so. Immediately upon receipt of that cable, plaintiffs' Barcelona office advised their New Orleans office, by cable sent over the defendant's lines, that the order was for 200, instead of 2,000 bales. Immediately upon receipt of the last-mentioned cable, plaintiffs' New Orleans office bought 1,800 bales of cotton for future delivery in January at 23.01 cents per pound, resulting in a loss to the plaintiffs of $31,095; that being the aggregate of the difference between the price at which the plaintiffs sold 1,800 bales and the price at which it subsequently bought the same number of bales and the commissions paid.

In the month of May, 1916, the defendant, acting through duly authorized representatives, filed with the Interstate Commerce Commission its classification of land line and cable messages and filing forms of such messages, together with the conditions under which the various classes of land line and cable messages are handled, and its tariffs and schedules, all which documents remained on file and unchanged at the time the message in question was sent. One of the classes of land line and cable messages so shown is unrepeated messages, as to which it was provided and shown on the filed forms that defendant was not liable for mistakes or delays in transmission or delivery, or for nondelivery, beyond the amount received for sending the same; the tariff rates for unrepeated messages being less than such rates for repeated messages. The amount paid for sending the message in question was the rate called for by such filed tariff for an unrepeated message from Barcelona, Spain, to New Orleans, La. The plaintiffs did not request to have the message in question repeated. If they had so requested, they would have been required to pay a higher rate. It is not usual to ask that such messages be repeated. The plaintiffs had no actual information of the filing by the defendant with the Interstate Commerce Commission of any forms, blanks, tariffs, or schedules. None of those forms or blanks were used at any time in the receiving or transmission of the message in question. The Interstate Commerce Commission has not adopted any rule or regulation requiring the filing of any tariffs, schedules, blanks, or forms of telegraph or cable companies.

Exceptions were reserved by the defendant to the action of the court in granting a motion of the plaintiffs to direct a verdict in their favor for the sum of $31,095, and in refusing a motion of the defendant that it direct a verdict in favor of the plaintiffs in the sum of $4.65, with interest at 5 per cent. from September 13, 1917.

[1] There was no evidence tending to prove that in any way the plaintiffs were made aware that the payment of more than was charged and paid for the transmission of the message was required to make the defendant liable to the plaintiffs for the loss or damage sustained by the latter in consequence of such a breach of duty as the one alleged and admitted. No evidence adduced would support a finding that the plaintiffs consented to the limitation of liability claimed by the defendant. What was disclosed was the tender and acceptance of the message for transmission, unaccompanied by any stipulation or condition as to the liability thereby incurred. From the acceptance, in the manner disclosed, of the message for transmission and delivery, it is not to be inferred that there was an understanding between the parties to the transaction that the service was undertaken on a condition limiting a carrier's liability for a default. The rate charged and paid was, unknown to the plaintiffs, less than the defendant's customary one for such a service when liability is not limited to the amount paid by the sender; but in no way did the plaintiffs assent to a limitation of the defendant's liability. The case is one of a carrier of messages according preferential treatment to a sender without the latter's knowledge or consent, and not one of a carrier stipulating for a limitation of liability for a negligent failure to transmit correctly. The rate charged and paid could not have signified a limitation of the carrier's liability to a sender who was not aware or notified of the condition on which that rate customarily was given.

[2] The defendant relies on provisions of the Interstate Commerce Act (Comp. St. Ann. § 8563 et seq.) to sustain the contention that, though the plaintiffs were unaware that the rate charged and paid for the transmission of the message was the filed tariff rate for an unrepeated message, and that according to that tariff a higher rate was required to be paid to make the defendant liable for more than the amount paid for the service, the plaintiffs are deprived of the right to recover more than that amount by provisions contained in documents on file with the Interstate Commerce Commission, of the existence and contents of which the plaintiffs had no knowledge or notice. Section 1 of that act, as amended June 18, 1910, provides that the provisions of the act shall apply to telegraph, telephone, and cable companies (whether wire or wireless), engaged in sending messages from one state, territory, or District of the United States to any other state, territory or District of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of the act, and that section contains the following provision:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property, and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: Pro-

vided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages."

Section 3 of the act contains the following provision:

"It shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Amended section 15 of the act empowers the Commission to determine and prescribe maximum rates for the transmission of messages by telegraph or telephone, and classifications, regulations, or practices of companies subject to the act and engaged in transmitting such messages. By amended section 20 of the act the Commission is empowered to require annual reports from all common carriers subject to the provisions of the act, and to prescribe forms of accounts required to be kept by such common carriers. At the time of the transaction in question the Commission had not, so far as telegraph, telephone, or cable companies are concerned, exercised any of the powers conferred on it by sections 15 and 20 of the act. By their terms many of the provisions of the act do not apply to telegraph, telephone, or cable companies. Among such inapplicable provisions are those requiring the adoption, filing, and publication of rates for interstate or foreign transportation, and regulations in regard to such transportation, and prohibiting and penalizing departures by either carriers or shippers from rates or regulations so filed and published. The act contains no requirement as to filing or publishing rates, classifications, rules, or regulations voluntarily adopted by telegraph, telephone, or cable companies.

[3] The above-quoted provision of section 1 of the act with reference to classification of messages by telegraph, telephone, or cable, and charging different rates for the different classes of messages, is a permissive, not a compulsory, one. It does not purport to give to the adoption and filing with the Commission of a classification by a carrier of such messages and of rates and regulations applicable to the different classes of messages the effect of binding a sender of a message by an adopted and filed regulation or provision of which the sender in no way is informed or notified. It does not purport to charge senders of messages with notice of classifications, rules, or regulations filed by the carrier with the Commission. It does not provide for a limitation of liability not contracted for by parties undertaking to transmit and deliver such messages. In the absence of a statutory or contractual modification of such liability the party in whose favor it is incurred, if there is a negligent failure to transmit the message correctly, is entitled to recover such damages as are the direct and natural result of that breach of duty, including special damages which the terms of the message disclose to be likely to result from such a default.

Nothing in the last referred to provision affects the question of the extent of the carrier's liability for a negligent failure to transmit correctly a message tendered and accepted under circumstances furnishing no basis for the conclusion that the sender assented to any modification or limitation of the carrier's liability for such a default.

[4] The other provisions of the act which must be relied on to support the contention made in behalf of the defendant are the above-quoted ones of sections 1 and 3, to the effect that charges for the transmission of messages by telegraph, telephone, or cable, or in connection therewith, shall be just and reasonable, unjust or unreasonable charges for such services being prohibited and declared to be unlawful, and that the giving of any undue or unreasonable preference or advantage, or the subjecting of any particular person, company, firm, corporation, or locality, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever are prohibited. Obviously the legislative motive for the enactment of those provisions was to protect parties procuring the services of the carriers mentioned from exactions by such carriers of unjust or unreasonable charges for such services, and from being made the victims of undue or unreasonable discriminations against such parties, and in favor of others having similar dealings with the carriers. It is not to be supposed that those provisions were intended to have the effect of enabling a carrier to escape liability for a breach of its undertaking to render a service in the line of the business in which it is engaged by showing that the party for whom that service was undertaken was, without the knowledge or fault of that party, charged less therefor than its reasonable value, or than was exacted of others for similar services, or otherwise was accorded undue preferential treatment. The provisions were intended for the benefit of parties unjustly discriminated against, and were not intended to enable a carrier to shield itself from the consequences of a breach of its obligation to a party who was an unconscious recipient of the carrier's preferential treatment.

Before by amendment of the act those provisions were made applicable to telegraph, telephone, and cable companies, and before by amendment of the act both interstate shippers and carriers of things and persons were required to conform to duly filed and published rates and regulations, the above-quoted provisions of sections 1 and 3 of the act were in force and applicable to such carriers of persons and things. While the statute law was in the condition just indicated, it did not, as to carriers then subject to its provisions, have such effect as is attributed to it in behalf of the defendant. In Merchants' Cotton Press & S. Co., v. Insurance Co. of North America, 151 U. S. 368, 14 Sup. Ct. 367, 38 L. Ed. 195, it was contended that the giving and acceptance of a rebate on a shipment of cotton rendered void the bills of lading issued by the carrier for the cotton, with the result that the carrier was not liable for the loss of the cotton. It was not shown that the consignees or owners knew of the rebate. In overruling that contention, the court quoted with approval the following from the opinion of the court whose judgment was under review:

"We are of opinion, however, and rest our decision upon the ground, that if it were assumed that the law was applicable, and the fact of agreement for rebate and special rate proven, it would not prevent liability on the part of the carrier for the freight received and covered by insurance in the hands of the carrier's agent. The law makes such agreements as to rebate, etc., void, but does not make the contract of affreightment otherwise void, and we think there is nothing in the law or the policy of it which requires a construction that would excuse a carrier from all liability when it made such a contract in connection with that for receipt and transportation of freight. Such a construction would encourage rather than discourage such unlawful agreements for rebates. The carrier might prefer them to liability for the freight. Such a contract for rebate would be void, and * * * could not be enforced; but we think the shipper could nevertheless recover for loss of his freight through the carrier's [and insurer's] negligence."

In deciding that under the law as it now is an interstate carrier is not liable under a stipulation in a shipping contract for a special service not provided for in its filed and published tariffs, the court was careful to point out that the question of the carrier being under such liability for the goods accepted for carriage as it lawfully could subject itself to was not presented for decision. Chicago & Alton Ry. Co., v. Kirby, 225 U. S. 155, 166, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. It seems that the reasons supporting the conclusion reached in the case of Merchants' Cotton Compress & S. Co. v. Insurance Co., supra, that the allowance of an unlawful rebate did not enable the carrier to escape liability for the goods undertaken to be carried, also would support the conclusion that the fact that there was an unlawful discrimination in favor of a sender of a telegraph or cable message would not enable the carrier of such message to escape liability for a negligent failure properly to transmit it, where the discrimination in favor of the sender was without his knowledge or consent. The ground on which courts refuse to enforce contracts made in contravention of such statutes as those above mentioned is that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction. Gibbs & Sterrett Mfg. Co. v. Brucker, 111 U. S. 597, 4 Sup. Ct. 572, 28 L. Ed. 534. That ground does not exist where the sender of a message, not by law chargeable with knowledge of the rate payable for the service he contracts for, unwittingly pays less than that rate for such service.

The opinion in the case of Mobile & Ohio R. Co. v. Dismukes, 94 Ala. 131, 10 South. 289, 17 L. R. A. 113, well illustrated how such provisions as the above-quoted ones of the Interstate Commerce Act would be perverted from the purpose of their enactment by giving them the effect attributed to them in behalf of the defendant. It may be supposed that not infrequently an applicant for telegraphic or cable service would find conveniently at hand blank paper on which to write his message and would be charged the unrepeated message rate, without anything being said about a limitation of the carrier's liability, if the adoption of that method of dealing could result in the carrier's liability for a negligent failure to transmit correctly being limited to the amount paid by the sender. The injustice of such a result is obvious where neither the law nor the party contracting to render service makes ade-

quate provision for notice to the party to be served of conditions on which the service is undertaken.

Under the Interstate Commerce Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 8563 et seq.) as it is now in force an interstate shipper is chargeable with notice of duly filed and published rates and conditions subject to which shipments at those rates are allowed, with the result that such a shipper is bound by a limitation of liability shown by the carrier's filed and duly published tariffs to be an incident of the rate charged. Boston & Maine R. R. Co., v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593. But such a shipper was not forbidden to depart from rates or regulations adopted by a carrier, and subjected to penalties for so doing, until the law afforded him adequate means of ascertaining what those rates and regulations are, without having to depend upon such information in regard thereto as the carrier might choose to impart. The act, as it was in force at the time of the transaction in question, did not require senders of interstate or foreign telegraph or cable messages to conform at their peril to rates or regulations adopted by carriers of such messages; and, in the absence of authorized action on the subject by the Commission, provided no means for the senders of such messages acquiring authentic information as to rates, classifications, or regulations adopted by such carriers. The senders of such messages have not been brought under the provisions of the act as amended, which bind an interstate shipper of goods to conform to duly filed and published rates and conditions applicable to his shipment, whether the shipper does or does not know of or assent to such rate and conditions. No provision of the act purports to put it in the power of a carrier of messages by telegraph or cable to bind senders thereof by conditions not brought to the notice of the latter. Nothing in the act manifests an intention to deprive a sender of such a message, who is the unconscious and innocent recipient of forbidden preferential treatment at the hands of the carrier, of the right to enforce the liability incurred by the latter by a breach of its undertaking.

In view of the facts just mentioned, we are of opinion that nothing contained in the act justifies the imputation to the law makers of the intention to give to the adoption by a carrier by telegraph or cable of interstate or foreign messages or rates, classifications, regulations, etc., and the filing thereof with the Commission, the effect of charging senders of such messages with notice of rates, classifications, regulations, etc., so adopted and filed, and of prohibiting and penalizing departures therefrom by such senders, who actually and without fault on their part are uninformed in regard thereto. Assuming, without admitting, that the contract which resulted from the acceptance in Europe of the message in question for transmission and delivery could not be enforced by the senders, if the act would not permit the enforcement of such a contract made in this country, we are of opinion that nothing in that act properly can be given the effect of enabling the defendant to limit its liability for the default alleged and admitted to the amount charged the plaintiffs for the service and paid by them without knowl-

edge or notice that it was less than the amount customarily paid for such a service when no limitation of liability is stipulated for.

The question as to whether the defendant had a valid claim against the plaintiffs for the amount of the difference between what was paid and what is payable for the service when no limitation of the defendant's liability is stipulated for was not in any way raised. It is not contended that the plaintiffs were not damaged, as a proximate result of the default alleged and admitted, in the amount for which a verdict in their favor was directed; nor is it contended that the terms of the message failed to indicate that such damages might result from such a default.

The conclusion is that the court did not err in giving the instruction requested by the plaintiffs. The judgment on the verdict rendered in pursuance of that instruction is affirmed.