GRAND RAPIDS SHOW CASE CO. *v.* POSTAL TELEGRAPH-CABLE CO.

1. COURTS—CONSTRUCTION OF FEDERAL STATUTE BY FEDERAL SUPREME COURT BINDING UPON STATE COURTS.

   The construction placed upon a Federal statute by the Supreme Court of the United States is binding upon the State courts.

2. COMMERCE — INTERSTATE COMMERCE — TELEGRAPHS AND TELEPHONES.

   By an amendment to the commerce act (36 U. S. Stat. p. 544 *et seq.*), congress has placed telegraph and telephone companies engaged in interstate business under Federal control, and State control and State statutes creating liability are superseded by said act.

3. SAME—RATES—PROVISION LIMITING LIABILITY FOR MISTAKE BINDING UPON SENDER.

   Where a telegraph company, engaged in interstate business,

with the approval of the interstate commerce commis-
sion, approved a certain rate for unrepeated interstate
messages, limiting its liability for mistakes therein, the
same was binding upon the sender whether it knew of
and assented to such limited liability or not, since the
purpose of the Federal statute regulating same was to
fix a uniform rate and a uniform liability, and assent
thereto by the sender was unnecessary. *Western Union
Telegraph Co.* v. *Esteve Bros. & Co.,* U. S. Adv. Ops.
1920-21, 653 (41 Sup. Ct. 584).

Error to Kent; Barton (Joseph), J., presiding.
Submitted April 20, 1921.    (Docket No. 30.)    De-
cided July 19, 1921.

Case by the Grand Rapids Show Case Company
against the Postal Telegraph-Cable Company for an
error in the transmission of an interstate message.
Judgment for defendant *non obstante veredicto.*
Plaintiff brings error.    Affirmed.

*Knappen, Uhl & Bryant,* for appellant.

*Louis T. Herman* (*William K. Clute,* of counsel), for
appellee.

Fellows, J.    Plaintiff claims to have suffered dam-
ages in the sum of $371.65 by reason of an error in
the transmission of an interstate message sent by de-
fendant for it from the Grand Rapids office to Wor-
cester, Mass., and brings this action to recover such
damages.    The message was an unrepeated night
lettergram and was telephoned by one of plaintiff's
employees to the Postal office.    The error in trans-
mission is not denied.    While the record discloses
that plaintiff did a large amount of telegraphing, its
business with defendant alone running between $100
and $200 monthly, and while it admits that it kept
telegraph blanks in its office, we think there was some
testimony in the case that it was unfamiliar with

the regulations, etc., found on the back of these blanks and that it made a case for the jury under the holding of this court in *Carland* v. *Telegraph Co.*, 118 Mich. 369 (43 L. R. A. 280).

Since that decision, however, the congress of the United States by an amendment to the commerce act (act of June 18, 1910, 36 U. S. Stat. p. 544 *et seq.*) has placed telegraph and telephone companies engaged in interstate business under federal control. It was the contention of the defendant in the court below, and here is, that by entering the field the congress by its action excluded State control of such companies, that State statutes creating liability are superseded and wiped out by this act, and that it must now be taken as the measure of liability of such interstate companies. The trial judge accepted this view of the law and although he submitted the case to the jury, he reversed the question under the Empson act (3 Comp. Laws 1915, § 14568 *et seq.*), and upon motion entered judgment for the defendant *non obstante veredicto*.

Upon the back of all the blanks used by defendant for night letters appears the following:

"THE POSTAL TELEGRAPH-CABLE COMPANY
(Incorporated.)
TRANSMITS AND DELIVERS THE WITHIN NIGHT LETTERGRAM SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:
"The Company will receive, not later than midnight, NIGHT LETTERGRAMS, written in plain English, to be transmitted only for delivery on the morning of the next ensuing business day, at rates still lower than its standard night message rate, as follows:
*   *   *
"1. The Company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any UNREPEATED message, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for

non-delivery, of any REPEATED message, beyond fifty times the sum received for sending the same, UNLESS SPECIALLY VALUED; nor in any case for delays arising from unavoidable interruption in the working of its lines; NOR FOR ERRORS IN CIPHER OR OBSCURE MESSAGES."

It is the contention of the plaintiff that it is not bound by the terms and limitations appearing on the back of these blanks because it did not write out the message in question on one of these blanks, that it telephoned the message in and was not responsible for the fact that it was written out on one of these blanks by defendant's employee, that the act of congress is not effective in granting exclusive Federal control, and that if it is, there is no evidence in the case that defendant has filed with the interstate commerce commission its rates, rules and regulations. Defendant replies that the act does give exclusive Federal control, that to transact business for plaintiff in any other manner or with any greater or different liability than with the public generally would work discrimination contrary to and in violation of the provisions of the commerce act, and that the act in question does not require the filing of its rates, rules and regulations with the interstate commerce commission.

It is true as contended by plaintiff's counsel and as pointed out by the interstate commerce commission in its report to congress (1911, I. C. C. Report, page 5) that the legislation assuming Federal control of interstate telegraph and telephone companies is somewhat inapt, incomplete and wanting in details. Some State courts of last resort and some inferior Federal courts have sustained plaintiff's contention. But the act before us is an act of congress, a Federal act, and if it has been passed upon and construed by the Federal court of last resort, that construction must be followed by us.

*Postal Telegraph-Cable Co.* v. *Lumber Co.,* 251 U.
S. 27 (40 Sup. Ct. 69), *Western Union Telegraph Co.*
v. *Boegli,* 251 U. S. 315 (40 Sup. Ct. 167), and *Clay
County Produce Co.* v. *Telegraph Co.,* 44 I. C. C.
670, strongly support the contention of defendant's
counsel, and the recent decision of the Supreme Court
of the United States in *Western Union Telegraph Co.*
v. *Esteve Bros. & Co.,* Adv. Ops. 1920-21, 653 (41
Sup. Ct. 584), handed down June 1st, is decisive in
his favor.     An examination of the case as reported
in 268 Fed. 22 will more fully disclose the facts.     It
will suffice for the purpose of this opinion to say
that Esteve Bros. & Co. had suffered a loss of $31,095
by an error of the telegraph company in the trans-
mission of a message.     The message originated at
Barcelona, Spain, and was correctly sent over the
Spanish government and French government lines to
Havre.     Here it was received by the telegraph com-
pany with no accompanying contract or limitations
and was correctly cabled to its New York office; from
there it was sent over its land lines to New Orleans.
In this transmission the error occurred.     Liability
of the telegraph company was sustained by the United
States district court for the eastern district of Louis-
iana and the circuit court of appeals, fifth circuit.
In reversing the case Justice Brandeis, speaking for
the court, said:

"The question presented for our decision is whether
since the amendment of June 18, 1910, to the act to
regulate commerce, the sender is, without assent in
fact, bound as matter of law by the provision limit-
ing liability, because it is a part of the lawfully es-
tablished rate.     *   *   *     In the third paragraph of
section 1 of the amended act, congress provided that
messages might be 'classified into day, night, repeated,
unrepeated, letter, commercial, press, Government, and
such other classes as are just and reasonable, and
different rates [might] be charged for the different

classes of messages.'   Acting, in May, 1916, under
the authority of that provision, the Western Union,
by appropriate action, approved the tariff involved
in the present case, and, by permission of the inter-
state commerce commission, filed with it the tariff,
including the provisions here in question.   The com-
pany was not required so to do by the terms of the
act or by any order of the commission; compare 25th
Annual Report I. C. C. (1911) pp. 5, 6.   *   *   *
If the general public, upon paying the rate for an
unrepeated message, accepted substantially the risk
of error involved in transmitting the message, the
company could not, without granting an undue pref-
erence or advantage, extend different treatment to the
plaintiff here.   The limitation of liability was an in-
herent part of the rate.   The company could no more
depart from it than it could depart from the amount
charged for the service rendered.

"The act of 1910 introduced a new principle into
the legal relations of the telegraph companies with
their patrons which dominated and modified the prin-
ciples previously governing them.   Before the act
the companies had a common-law liability from which
they might or might not extricate themselves, accord-
ing to views of policy prevailing in the several States.
Thereafter, for all messages sent in interstate or
foreign commerce, the outstanding consideration be-
came that of uniformity and equality of rates.   Uni-
formity demanded that the rate represent the whole
duty and the whole liability of the company.   It could
not be varied by agreement; still less could it be varied
by lack of agreement.   The rate became, not, as be-
fore, a matter of contract, by which a legal liability
could be modified, but as a matter of law, by which
a uniform liability was imposed.   Assent to the terms
of the rate was rendered immaterial, because, when
the rate is used, dissent is without effect.   *   *   *
So, here, the limitation of liability attached to the un-
repeated cable rate is binding upon all who send mes-
sages to or from foreign countries until it is set aside
as unreasonable by the commission.

"It is strongly argued that the rule is not applicable
to the situation before us, because of the difference in
the provisions of law which govern the establishment

of railroad and of telegraph rates. The railroad rate is established, and can only be established, by filing the tariff with the commission. Telegraph companies may initiate rates without filing tariffs with the commission (*Clay County Produce Co.* v. *Telegraph Co., supra*). Plaintiffs insist that it is the filing and subsequent publication of the railroad rate which gives it the force of law, and requires the shipper to take notice of it. But the contention, by dwelling unduly upon the procedural features of the act, would defeat the end which congress had in view. Both railroad and telegraph-cable rates are initiated by the carrier. It is true that a railroad rate does not have the force of law unless it is filed with the commission. But it is not true that out of the filing of the rate grows the rule of law by which the terms of this lawful rate conclude the passenger. The rule does not rest upon the fiction of constructive notice. It flows from the requirement of equality and uniformity of rates laid down in section 3 of the act to regulate commerce. Since any deviation from the lawful rate would involve either an undue preference or an unjust discrimination, a rate lawfully established must apply equally to all, whether there is knowledge of it or not."

This opinion from which we have quoted at considerable length is decisive of every contention of plaintiff's counsel.

The judgment must be affirmed.

STEERE, C. J., and MOORE, WIEST, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.