THOMAS CANNING CO. *v.* SOUTHERN PACIFIC CO.

1. APPEAL AND ERROR—CITATION OF STATUTES IN BRIEFS.

   In citing either a Federal or State statute in their briefs, counsel should give the volume and either the section or page where it may be found.

2. COMMERCE—CARRIERS—RAILROADS—INTERSTATE COMMERCE COMMISSION—TARIFFS—CONTRACTS.

   The tariffs and schedules of an interstate carrier filed with the interstate commerce commission become a part of the contract, and, as such, binding on the parties, since to hold otherwise would open the door for unjust discrimination and defeat the purpose of the Federal statute (30 U. S. Stat. p. 380).

3. SAME—LIMITED LIABILITY OF CARRIER BINDING UPON SHIPPER.

   The limited liability of an interstate carrier, provided in its tariff filed with the interstate commerce commission when a uniform bill of lading is used, was binding upon a shipper who paid the reduced rate therein provided, although a uniform bill of lading was not used.

4. SAME—RELATIONS ARE CONTRACTUAL.

   The relations of a shipper and a carrier of interstate commerce are contractual, and it is unimportant that the terms of the contract are fixed by law rather than by agreement of the parties, since neither party can deviate therefrom without discrimination which is the important thing inhibited.

5. SAME—RAILROADS—SUITS COULD BE BROUGHT AGAINST CARRIER DURING FEDERAL CONTROL.

   Under section 10 of the Federal control act, an action at law or a suit in equity could be brought against a carrier during the period of Federal control for a cause of action arising prior thereto, although its property during said time was exempt from process.

6. SAME—LIMITATION OF ACTIONS—SUSPENSION.

   That the property of a carrier was exempt from process during the period of Federal control did not affect the shipper's right to sue for a shortage, and unless said

right was exercised within the time limited in the bill of lading it was lost.

7. SAME—TRANSPORTATION ACT—CONSTRUCTION—PERIOD OF LIMITATION FIXED BY CONTRACT NOT SUSPENDED.

The words "periods of limitation" in section 206*f* of the transportation act of 1920 (41 U. S. Stat. p. 462), providing that "The period of Federal control shall not be computed as a part of the periods of limitation in actions against carriers," etc., construed, and *held*, in view of subdivision *a* of the same section, and that the power of a legislative body to change the period of limitation fixed by contract is doubtful, to refer to the periods of limitation "now prescribed by State and Federal statutes" and not to the periods of limitation fixed in the contract by the parties themselves.

8. STATUTES—CONSTRUCTION—CONSTITUTIONAL LAW.

In the construction of statutes courts should lean towards that construction which will give the statute force and validity rather than to that which will nullify it.

Error to Kent; McDonald (John S.), J.   Submitted April 20, 1922.   (Docket No. 70.)   Decided July 20, 1922.

Case by the Thomas Canning Company against the Southern Pacific Company for damage to certain beans in transit.   Judgment for plaintiff on a directed verdict.   Defendant brings error.   Reversed.

*Oscar E. Waer,* for appellant.

*Colin P. Campbell,* for appellee.

Plaintiff shipped from points in California to itself at Grand Rapids three car loads of beans.   The dates of the shipments were January 8, 1917, March 19, 1917, and March 23, 1917.   Defendant was the initial carrier.   A uniform order bill of lading was issued for one of the cars.   It contained in section 3 the following provisions:

"Except where the loss, damage, or injury complained of is due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, as conditions precedent to recovery, claims must be made in writing to the originating or delivering carrier within six months after delivery of the property (or, in case of export traffic, within nine months after delivery at port of export), or, in case of failure to make delivery, then within six months (or nine months in case of export traffic) after a reasonable time for delivery has elapsed; and suits for loss, damage, or delay shall be instituted only within two years and one day after delivery of the property, or, in case of failure to make delivery, then within two years and one day after a reasonable time for delivery has elapsed."

The bill of lading for one of the other cars was not a uniform order bill of lading but had stamped on it the following:

"Section 3 of the uniform bill of lading is amended by supplement 6 to western classification No. 53, effective June 2, 1915, and all reissues thereof."

The other bill of lading was not a uniform order bill of lading and bore no stamp or rider. Rules A, B, C, D and E of section 16 of the published tariff of defendant on file with the interstate commerce commission are as follows:

"(A) Unless otherwise provided, when property is transported subject to the provisions of this tariff, the acceptance and use are required, respectively, of the 'uniform bill of lading,' 'straight' or 'order,' as shown on pages 96 to 99, inclusive.

"(B) In order that the consignor may have the option of shipping property, either subject to the terms and conditions of the uniform bill of lading, or under the liability imposed upon common carriers by common law and the Federal and State statutes applicable thereto, this tariff provides for different rates and for different forms of bills of lading to be used, respectively, as the consignor may elect to have

a limited liability or a common carrier's liability service.

"(C) Unless otherwise provided in this tariff, property will be carried at the reduced rate specified if shipped subject to all the terms and conditions of the uniform bill of lading. If consignor elects not to accept all the terms and conditions of the uniform bill of lading, he should so notify the agent of the forwarding carrier at the time his property is offered for shipment. If he does not give such notice, it will be understood that he desires his property carried subject to the terms and conditions of the uniform bill of lading in order to secure the reduced rate.

"(D) Property carried not subject to all the terms and conditions of the uniform bill of lading will be at the carrier's liability, limited only as provided by common law and by laws of the United States and of the several States in so far as they apply, but subject to the terms and conditions of the uniform bill of lading, in so far as they are not inconsistent with such common carrier's liability, and except as may be otherwise specifically provided herein, the rate charged therefor will be ten (10) per cent. higher (subject to a minimum increase of one (1) cent per hundred pounds) than the rate charged for property shipped subject to all the terms and conditions of the uniform bill of lading.

"(E) When the consignor gives notice to the agent of the forwarding carrier that he elects not to accept all the terms and conditions of the uniform bill of lading, but desires a carrier's liability service at the higher rate charged for that service, the carrier must print, write or stamp upon the bill of lading a clause reading:

"'In consideration of the higher rate charged, the property herein described will be carried at the carrier's liability, limited only as provided by law, but subject to the terms and conditions of the uniform bill of lading, in so far as they are not inconsistent with such common carriers' liability.'"

Plaintiff paid the regular rate, 75 cents per hundred, fixed in the tariffs on file with the interstate commerce commission when the uniform bill of lading is used.

The last of the shipments was delivered to plaintiff at Grand Rapids on April 27, 1917. There was a shortage in two of the shipments and the other shipment was damaged by oil. On December 28, 1917, the Federal government assumed control over the transportation systems of the country including the system of defendant pursuant to the proclamation of the president of December 26 (40 U. S. Stat. p. 1733). Federal control terminated March 1, 1920 (41 U. S. Stat. p. 457). This action was brought November 8, 1920. Both parties conceded that the case presented questions of law only and a directed verdict for each was asked. One was directed for the plaintiff.

FELLOWS, C. J. (*after stating the facts*). The questions involved in this case are of outstanding importance and have required considerable research. The briefs of counsel have been very helpful, but in one particular they have not been as helpful as they might have been made, and as the fault is one quite common to the profession, we refer to it in passing. Several Federal statutes are here involved. In no instance has the official edition, the United States Statutes at Large, been cited. In citing unofficial editions, counsel in several instances have omitted giving the section or the page of the unofficial edition where the statute would be found. It can hardly be expected that members of this court can remember in which volume and at what page of the United States Statutes at Large the Federal control act, the Carmack amendment or the Transportation act will be found. Counsel should always in their briefs when dealing with a statute, either Federal or State, give the proper citation. To do so will be helpful to the court; to fail to do so imposes upon this court drudgery which should not be required.

When this case was tried in the court below the only case from the Federal courts squarely deciding

the questions here involved cited to the trial judge was *Lazarus* v. *Railroad Co.*, 271 Fed. 93. So far as we are advised by counsel or so far as we are able to discover that case was then the only Federal decision squarely deciding the questions involved in this case. It sustained the plaintiff's contentions. The questions being Federal questions, the court quite properly followed it. Since this case was tried that case has been reviewed in the circuit court of appeals, second circuit, and will be found reported in 278 Fed. 900, under the title of *New York Cent. R. Co.* v. *Lazarus.* The circuit court reversed the district court and in the opinion filed sustains fully the contention of the defendant in the instant case. We agree with the conclusion reached by the circuit court of appeals and might content ourselves with citing that case and going no further. But the questions here involved are of such importance to both the shipping public and the carriers that we feel a more extended consideration of them is necessary. It must be borne in mind that we are here dealing with a shipment in interstate commerce over which congress acting within the limitations of the Federal Constitution has complete control.

The first question which confronts us is whether the schedules and tariffs of defendant company filed with the interstate commerce commission become a part of the contract of shipment and as a part of the contract binding upon the parties to it. Incidental to and as a part of this question is the inquiry as to whether the relation of the parties was contractual or a status fixed by operation of law. In the schedules filed with the interstate commerce commission it was stated that unless otherwise provided the uniform bill of lading was to be accepted and used. The shipper, however, was given the option of electing not to ship under and be bound by the bill of lading with the

limitations found in it, and if he so elected and paid a higher rate a different liability of the carrier was thereby created. The plaintiff did not elect to pay the higher rate and secure the greater liability, but paid the rate provided for if the uniform bill of lading was used. The first part of the question does not become important in considering the shipment for which the uniform bill of lading was issued, nor are we persuaded that it is of great importance in considering the bill of lading where the uniform bill of lading was incorporated by reference although the supreme court of Maine in *Mason* v. *Railroad Co.*, 119 Me. 195 (110 Atl. 425), declined to treat the rider as a part of the contract. The question does become important in considering the other bill of lading.

In section 3 of the act creating the interstate commerce commission (24 U. S. Stat. p. 380) it was provided:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

In the case of *Grand Rapids, etc., R. Co.* v. *Cobbs & Mitchell*, 203 Mich. 133, speaking of the acts creating the interstate commerce commission and the various State commissions, this court said:

"Running through this legislation may be found the steadfast purpose of the legislative department to eradicate, root and branch, unjust discrimination for special shippers and the requirement of like charge and like service to all."

Courts have uniformly construed such acts having

in mind the predominating purpose of preventing unjust discrimination for the benefit of favored shippers. In *New York Cent. R. Co.* v. *Lazarus, supra,* the shipment was from Singapore, China, to New York. The New York Central issued no bill of lading but the rate paid was the rate fixed by the tariffs on file for shipment under the uniform bill of lading. It was held by the court that the uniform bill of lading became the contract and the same provision limiting the right to bring an action to the period of two years and one day which is here involved was a part of the contract and available to the defendant in an action thereafter brought.

In *Chicago, etc., R. Co.* v. *Cramer,* 232 U. S. 490 (34 Sup. Ct. 383), it was held by the Supreme Court of the United States (we quote from the syllabus) :

"In enforcing liability of the carrier for interstate shipments the provisions in the regularly filed tariff enter into and form part of the contract of shipment, and if that tariff offers two rates based on value and the shipper declares the lower value so as to avail of the lower rate, the carrier may avail of the lower value so declared."

In *Atchison, etc., R. Co.* v. *Robinson,* 233 U. S. 173 (34 Sup. Ct. 556), it was held (again quoting from the syllabus) :

"The shipper, as well as the carrier, is bound to take notice of the filed tariff rates, and so long as they remain operative they are, in the absence of attempts at rebating or false billing, conclusive as to the rights of the parties. *Great Northern R. Co.* v. *O'Connor,* 232 U. S. 508 (34 Sup. Ct. 380).

"An oral agreement cannot be given a prevailing effect which will be so contrary to the filed schedules. To do so would open the door to special contracts and defeat the primary purpose of the interstate commerce act to require equal treatment of all shippers and the charging to all of but one rate, and that the rate filed as required by the act."

See, also, *Missouri, etc., R. Co.* v. *Harriman,* 227
U. S. 657 (33 Sup. Ct. 397) ; *Kansas City Southern R.
Co.* v. *Carl,* 227 U. S. 639 (33 Sup. Ct. 391) ; *Boston &
Maine Rd.* v. *Hooker,* 233 U. S. 97 (34 Sup. Ct. 526,
L. R. A. 1915B, 450, Ann. Cas. 1915D, 593).    In
*Grand Rapids Show Case Co.* v. *Telegraph-Cable Co.,*
215 Mich. 30, this court held:

"Where a telegraph company, engaged in interstate
business, with the approval of the interstate commerce
commission, approved a certain rate for unrepeated
interstate messages, limiting its liability for mistakes
therein, the same was binding upon the sender whether
it knew of and assented to such limited liability or
not, since the purpose of the Federal statute regulat-
ing same was to fix a uniform rate and a uniform
liability, and assent thereto by the sender was un-
necessary."

In so holding we but followed the decision of the
Supreme Court of the United States in *Western Union
Telegraph Co.* v. *Esteve Bros. & Co.,* 256 U. S. 566
(41 Sup. Ct. 584).

All of these cases and many others hold that the
tariffs and schedules filed with the interstate com-
merce commission become a part of the contract and
as such binding on the parties.    To hold otherwise
would open wide the door for unjust discrimination.

An interesting case which by analogy is applicable
is *Eberhart* v. *United States,* 123 C. C. A. 180, 204
Fed. 884, decided by the circuit court of appeals,
eighth circuit.    A contractor's bond had been given
pursuant to the provisions of a Federal statute.    It
was held that the statute became a part of the bond
and the liability could not be changed by subsequent
legislation.    We shall have occasion to refer to this
case later.

The relations of the shipper and carrier are con-
tractual.    It is unimportant in determining such re-
lation that the law requires a certain contract and in-

hibits all others, or that as matter of law other conditions than those found in the writings are read into it. In order to prevent discrimination the law has provided that certain things shall be done in all shipments. Neither the shipper nor the carrier can deviate from them without discrimination which is the important thing inhibited. The fact that a contract is required by law to be in a certain form and to contain certain provisions does not change the relations of the parties. Our insurance laws require a standard form of policy, but when the policy is issued it forms the contract of the parties and their relations are contractual.

Should the period of Federal control be deducted from the contract period of limitation? If so, this action was seasonably brought and we need proceed no further. If not, another question requires discussion. In section 10 of the Federal control act (40 U. S. Stat. p. 456) it is provided:

"Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government. Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control or of any act of congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control."

By the express terms of this section suits could be brought and judgments rendered against the car-

riers.   That the government should not be hampered in the prosecution of the war, the property of the carriers then being operated by the government was for the time being made exempt from process.    In *West* v. *Railroad Co.*, 233 Mass. 162 (123 N. E. 621), it was tersely said:

"It is manifest, although no attachment or levy can be made, that neither the resolution, the proclamation thereunder, nor the subsequent statute prohibits actions for damages in accordance with the civil procedure prescribed by the States."

In the recent case of *Missouri Pac. R. Co.* v. *Ault*, 256 U. S. 554 (41 Sup. Ct. 593), Mr. Justice Brandeis, speaking for the court, said:

"The plain purpose of the above provision was to preserve to the general public the rights and remedies against common carriers which it enjoyed at the time the railroads were taken over by the president except in so far as such rights or remedies might interfere with the needs of Federal operation.   The provision applies equally to cases where suits against the carrier companies were pending in the courts on December 28, 1917; to cases where the cause of action arose before that date and the suit against the company was filed after it; and to cases where both cause of action and suit had arisen or might arise during Federal operation.   The government was to operate the carriers, but the usual immunity of the sovereign from legal liability was not to prevent the enforcement of liabilities ordinarily incident to the operation of carriers.   *   *   *
"This purpose congress accomplished by providing that 'carriers while under Federal control' should remain subject to all then existing laws and liabilities and that they might sue and be sued as theretofore.   *   *   *
"Thus, under section 10, if the cause of action arose prior to government control, suit might be instituted or continued to judgment against the company as though there had been no taking over by the government, save for the immunity of the physical property

from levy and the power of the president to regulate suits in the public interest as by fixing the venue, or the time for trial."

That the property of the carriers then needed by the government was not subject to process, that certain statutory proceedings which would submit it to process were inhibited, does not alter the legal question. The right to sue existed, was in no way abridged and unless exercised within the period of limitation was lost.

This brings us to the question of the construction and validity of section 206 (*f*) of the transportation act of 1920 (41 U. S. Stat. p. 462) which reads as follows:

"The period of Federal control shall not be computed as a part of the periods of limitation in actions against carriers or in claims for reparation to the commission for causes of action arising prior to Federal control."

The words in this section calling for construction being "periods of limitation." These words are used in a previous subdivision of the same section (206a), which reads as follows:

"Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the president of the railroad or system of transportation of any carrier (under the provisions of the Federal control act, or of the act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the president for such purpose, which agent shall be designated by the president within thirty days after the passage of this act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this act, be brought in any court which but for the Federal

control would have had jurisdiction of the cause of action had it arisen against such carrier."

It will be noted that the periods of limitation referred to in subdivision (a) are the periods of limitation "now prescribed by State and Federal statutes," and it is insisted that congress in using the same language in the subsequent subdivision had reference to such periods of limitation and not to periods of limitation fixed by contract; that if contract periods of limitations are meant the subdivision is in collision with the Federal Constitution.

The right of the legislative body to fix a statutory period of limitation and to change or repeal it without conflicting with rights secured by the Constitution must be recognized. *Campbell* v. *Holt,* 115 U. S. 620 (6 Sup.. Ct. 209). But the right to extend a period of limitation fixed by contract is another question. The first is recognized, the second is, to say the least, of doubtful validity. See *New York Cent. R. Co.* v. *Lazarus, supra.* Recurring to *Eberhart* v. *United States, supra,* it will be noted that after the period of limitation provided for in the contract had expired, congress passed an act authorizing the institution and maintenance of a suit upon the bond. It was held that the act of congress could not revive a liability which by the terms of the bond had theretofore terminated. In the construction of statutes courts should lean towards that construction which will give the statute force, validity, not to that construction which will nullify it. Congress must be deemed to have intended the enactment of a valid piece of legislation rather than an invalid one or one of doubtful validity. It used the language under consideration in subdivision (a) in a manner which could leave no doubt as to its validity. We must assume that it so intended the use of the same expression in a subsequent portion of the same section. Such a construc-

tion of section 206 (*f*) gives it force and renders it free from assault on constitutional grounds. We are persuaded that such construction should obtain and that it was not intended by congress by this legislation to deprive parties of their contract rights or to change or alter the periods of limitation they had themselves agreed upon.

Upon the argument of the case in this court it was suggested by plaintiff's counsel, apparently for the first time, that this was an action for negligence. It is a sufficient answer to this contention to say that the trial judge was not asked to submit the question of negligence to the jury nor is there in this record any evidence justifying the submission of that question to the jury.

It follows from what has been said that the case must be reversed with a new trial.

Defendant will recover costs of this court.

WIEST, CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred. McDONALD, J., did not sit.